### SEATTLE RENTON LUMBER CO. v. UNITED STATES.
### No. 10274.

Circuit Court of Appeals, Ninth Circuit.
May 24, 1943.

---

Weter, Roberts & Shefelman, of Seattle, Wash., for appellant.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Helen R. Carloss, Maryhelen Wigle, and Helen Goodner, Sp. Assts. to Atty. Gen., and J. Charles Dennis, U. S. Atty., and Thomas R. Winter, Sp. Asst. to Chief Counsel, B. I. R., both of Seattle, Wash., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This appeal is from an adverse judgment in a suit to recover income and excess profits taxes paid under protest. The question for determination is whether the taxpayer—appellant—received income from the operation of a lumber mill subsequent to June 30, 1933, at which time it undertook to dispose of all its operating property to its stockholders.

The taxpayer was incorporated in 1929 under the Washington laws, after which it built a sawmill and was continuously engaged in the manufacture and sale of lumber until the end of June 1933. It had outstanding 900 shares of stock, all held by a small and closely integrated group of people. The chief stockholders, who were also the corporate trustees, were Roberts, Weter, and Carlson, these owning a total of about 680 shares. Roberts and Weter were partners in a Seattle law firm. Carlson was manager of the mill and a long-time associate of Roberts. The remaining stock was owned in small blocks by ten individuals, all of whom were members of Roberts' immediate family or were related to him by marriage.[1] Beginning with the spring of 1933 Roberts discussed with the shareholders, singly and in groups, the matter of discontinuing the corporate operation and of transferring the mill and business to the shareholders as partners, the purpose being to reduce income taxes. All were agreed that this be done.

Ordinarily the taxpayer took inventory and made its semi-annual profit and loss statements on June 30 and December 31 of each year. Steps were taken by Roberts, Carlson, and the mill bookkeeper to get the books in shape so that the transfer could be effected on the last day of June 1933. Two weeks before that date formal notice was given the shareholders of a special meeting to pass upon the sale of the assets to the contemplated partnership. On June 30 the trustees and stockholders met, the meetings being held at the law office of Roberts and Weter rather than at the mill eight miles away, as scheduled in the notice. Most of the shareholders did not attend but the great bulk of the stock was personally represented. At the meeting resolutions were adopted by the trustees and by the shareholders present for the sale of all the corporate assets, except accounts receivable,[2] to a partnership to be composed of the individual shareholders. Thereupon a deed was executed and delivered conveying the real property—the mill and the ground on which it stood—to Roberts who concurrently executed a declaration reciting that he held the property in trust for the partners, doing business as Seattle Renton Mill Co., naming them and designating their respective interests. At the same time the taxpayer executed a bill of sale of all its movable property to the Seattle Renton Mill Co., a partnership.

After that date separate records were kept for the partnership, and the mill and business were conducted under the name of Seattle Renton Mill Co. Partnership bank accounts were opened, the signs on the mill and motor vehicles were changed to show the new name, and the old stationery, bill forms, checks, etc., were changed by pencil or by rubber stamp until the existing supply ran out, when new supplies were procured and printed with the name of the partnership thereon. When customers and others inquired concerning the change in name they were informed that the enterprise was being operated as a partnership. The business was in fact as well as in form so operated, although no formal articles of partnership were executed nor certificate of assumed name filed. The deed, declaration of trust, and bill of sale were not then recorded. In March 1934 the income from the business for the last half of 1933 was reported by the former shareholders in their individual income tax returns in

---

[1] A few shares stood in the names of Carlson's wife and their two small children, but these were shown to belong to Carlson and were so treated.

[2] The finances of the corporation were conducted on a current basis. At the date of the transaction in question bills payable and bills receivable approximately offset each other, and the accounts receivable, some of which were regarded as not good, were retained as a matter of convenience and to avoid troublesome tax questions.

proportion to their respective interests. Subsequently the Commissioner assessed this income to the corporation itself on the theory that no change had actually been effected.

The evidence in the suit for refund was heard by Judge Cushman, but because of ill health the judge retired before rendering any decision. On stipulation the matter was submitted to Judge Black for decision upon the transcript of the evidence without further testimony. The judge held against the taxpayer.

■ In support of the decision the Commissioner stresses the failure to record the instrument of conveyance, the lack of execution of formal articles of partnership, and the circumstance that the certificate of assumed name was not filed by the partnership as contemplated by a Washington statute. However, it is conceded that under Washington law an unrecorded conveyance of real property is valid as between the parties and is good as against all persons having actual knowledge thereof. Sec. 10596—2 Remington Rev.Statutes Wash. Similarly, the filing of a certificate of assumed business name is not a condition precedent to the existence of the partnership, but merely to the bringing of suit. It may effectively be filed at any time prior to the commencement of an action. Powelson v. Seattle, 87 Wash. 617, 152 P. 329. Nor was it essential in any sense that articles of partnership be drawn up and signed. In Washington, as elsewhere, a partnership may be formed orally and may result from the acts or conduct of the parties, provided it can be determined therefrom that such was the intention.[3] Roediger v. Reid, 133 Wash. 608, 234 P. 452, 238 P. 581; Will v. Domer, 134 Wash. 576, 236 P. 104; Causten v. Barnette, 49 Wash. 659, 96 P. 225.

■ In the view of the trial court the crucial question was thought to be "whether or not there was a partnership on or before June 30, 1933." It was believed that the absent stockholders merely contemplated the formation of the partnership at some indefinite future time and were not shown to have consented presently to become partners; hence on the date of the meeting no partnership was in existence capable of carrying on or of receiving title to the corporate assets. We think, with all defer-

ence, that the court created difficulties where none in fact existed. It was shown without dispute that the shareholders were in complete agreement on the matter of discontinuing the corporate operation of the business. They were aware of the holding of the meeting and of its purpose, namely, to consummate in legal form the understanding already arrived at by common consent. In fairness we ought not to close our eyes to the prior understanding and subsequent conduct of this small and closely integrated group. In the circumstances shown, the absence of some of its members from the meeting proves nothing beyond their willingness to let the chief shareholders do what was necessary to be done to effectuate the common purpose.

The corporation divested itself of its tangible assets and did not thereafter operate the business. No question of estoppel or of reliance on appearances is involved in the case, and there is no pretense that these people acted otherwise than in entire good faith. They were entitled to weigh the advantages of the corporate operation as against its disadvantages taxwise, and to choose the alternative partnership method of holding title to the mill property and of carrying on their business affairs. We think that in fact and in form they took all the steps necessary to accomplish the change unanimously desired.

Reversed.

---

[3] It is unnecessary to consider whether the local rule is controlling, as counsel concede that Washington law and the general law on the subject are not different.